# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**KMART CORPORATION,**

        **Plaintiff,**

v.                                          Case No. 8:08-cv-418-T-30TGW

**ACO, INC., et al.**

        **Defendants.**

_____/

## **ORDER**

THIS CAUSE comes before the Court upon cross motions for summary judgment filed by Plaintiff Kmart Corporation ("Kmart"), Defendant ACO, Inc. ("ACO"), and Defendant Dale Mabry Skyways, Inc. ("Dale Mabry").[1] The Court, having reviewed the motions, responses, and supporting memoranda, having heard oral argument from the parties, and being otherwise fully advised in the premises, determines Kmart's motion should be granted and Defendants' motions should be denied.

## **Background**

At issue in this lawsuit is a dispute over the rights and obligations of the parties to a commercial real property lease with respect to the payment of additional percentage rent. Defendant Dale Mabry is the owner of the subject property. Defendant ACO leases the property from Dale Mabry. ACO in turn sublets the property to Kmart pursuant to the terms

---

[1] Dale Mabry's corporate representative testified that Defendant Tropical Gardens of Florida, Inc. ("Tropical Gardens") ceased to exist in 1988 when it merged with Dale Mabry. Plaintiff has not disputed this fact.

of a 1972 lease between Kmart's predecessor and ACO's predecessor (the "Lease"). Kmart operates a retail store on the property. Kmart also sub-sublets a portion of the property to a Miami Subs restaurant.

Pursuant to Article 3 of the Lease, Kmart is required to pay ACO an annual minimal rental of $271,000.00 plus real estate taxes. Article 4 of the Lease requires Kmart to pay ACO an "additional rental" amount equal to one percent (1%) of gross sales exceeding $8,830,000.00 in a given lease year.[2] Article 5 of the Lease allows Kmart to deduct real estate taxes and assessments paid on the property in excess of $40,000.00 from the additional rental amount.

In March of 1993, Kmart entered into a Third Amendment of the Lease with ACO's predecessor. The purpose of the Third Amendment was to adjust the rental calculation of the additional rent because of a building expansion proposed by Kmart. The Third Amendment was drafted by Kmart. Article 2 of the Third Amendment provides as follows:

> 2. In the event Tenant expands the Building, and its gross sales are equal to or better than its gross sales for each of the two lease years immediately preceding the lease year in which the expanded portion of the Building is open to the general public (the "expansion year"); then, Tenant's gross sales for the purpose of determining its additional rental obligation pursuant to Article 4 shall be adjusted by multiplying its gross sales by a fraction, the numerator of which is the original store size and the denominator is the expanded store size with the resulting product representing gross sales for the purposes of Article 4. If, after this adjustment, the additional rental obligation is less than it was for either of the two lease years immediately preceding the expansion year, then Tenant's additional rental obligation shall be equal to the greater of the

---

[2]The parties have previously disputed whether gross sales for the purpose of the additional rental calculation should include the gross sales of the Miami Subs restaurant. However, the parties now agree that the Miami Subs gross sales should be included for purposes of this calculation.

amount paid by Tenant in either of those two years immediately preceding the expansion year.  <u>If, after Tenant expands the building, gross sales are less than the gross sales from either of the two years immediately preceding expansion year, then there shall be no adjustment to gross sales as provided in this Article 2</u>.  Landlord and Tenant agree that the two comparison lease years shall be the lease years ending November 30, 1992 and November 30, 1993.

(emphasis added).  With respect to the excess tax credit contemplated in Article 5 of the Lease, Article 3 of the Third Amendment provides as follows:

> 5. The excess tax credit provided for in Article 5 of the Lease shall not include any real estate taxes attributed to the expanded portion of the Building. In the event the tax records do not separately identify the portion of the taxes attributed to the expansion then the taxes on the building as expanded shall be multiplied by a percentage representing the ratio of the expansion size to the size of the Building as expanded.

The parties' dispute relates to their conflicting interpretations of Article 2.  ACO and Dale Mabry contend the provision guarantees ACO a "Base Percentage Rent" based on the lease year ending November 30, 1992.[3]  ACO and Dale Mabry argue the conduct of the parties since the execution of the Third Amendment is consistent with this interpretation.  Kmart argues the language of Article 2 is clear and unambiguous in that Kmart is not obligated to pay a minimum percentage rent to ACO or Dale Mabry in those years in which its gross sales are less than its gross sales in 1992.[4]  Kmart seeks declaratory relief to this effect, and also seeks declaratory relief entitling it to a refund or offset from future rents for the amounts it has overpaid to ACO for percentage rent from 2003-2008.

---

[3]In 1992, Kmart's gross sales amount was $15,271,749, which exceeded the 1993 amount of $14,175,267.

[4]ACO is obligated to pay Dale Mabry one-half of the rental payments it receives from Kmart under the Third Amendment.

In August of 1993, ACO acquired its interest in the Lease from its predecessor Kenneth Young d/b/a Hannan Properties. Kmart expanded the building in 1994. Therefore, the lease year ending October 31, 1994, was the first year the parties were required to interpret and apply the Third Amendment. Kmart's adjusted gross sales for the 1994 lease year were lower than in 1992. Based on its interpretation of the lease, Kmart did not pay ACO any additional rent in December of 1994.

In December of 1994, ACO's representative, Charles Andrews, had a telephone conversation with Kmart Real Estate Representative William Moreland and Kenneth Young, the prior landlord under the Lease who negotiated the Third Amendment. During the conversation Young expressed his belief that the Third Amendment had established a minimum percentage rent equal to the amount paid in 1992. On or about December 12, 1994, Andrews had a separate conversation with Young's attorney, Mark Greenfield, who explained that Young had agreed to establish a minimum percentage rent to avoid an annual confrontation match with Kmart. Andrews memorialized these conversations in a December 12, 1994 letter addressed to Moreland, which he concluded by stating "you are in default of your Lease, as Amended by the Third Amendment to Lease for payment of percentage rent . . . established by the 1992 percentage rent." Neither Moreland nor Kmart responded to the letter. Moreover, Kmart did not pay any additional rent for the 1994 lease year. ACO took no further action at that time to collect from Kmart or enforce its interpretation of the Lease.

For the lease years 1995-2000, Kmart paid ACO additional rent. In some of these years Kmart's sales exceeded the 1992 figure, and in some years gross sales were less than

in 1992. However, in each of these years Kmart paid less in additional rent than it paid in 1992.[5] In other words, Kmart did not pay ACO a minimum additional rental amount in this time period during the years in which its gross sales were below the 1992 figure.

In 2001, Eric Andrews, the son of Charles Andrews and also an ACO representative, faxed a letter to Kmart's real estate accounting supervisor Lamont Monat. The letter memorialized a phone conversation between Eric Andrews and Monat regarding the calculation of Kmart's additional rent. In response to the letter, Kmart delivered a revised 2001 Annual Form signed by Monat that included the phrase "PAY THE GREATER OF 1992 OR CURRENT." The number "$40,052.87" appeared next to the phrase.[6] This revised form was utilized by Kmart for the lease years 2001-2004. For the lease years 2001 and 2002, Kmart's gross sales exceeded 1992 gross sales. For the lease years 2003 and 2004, Kmart's gross sales did not exceed the 1992 amount. However, Kmart paid ACO $40,052.87 for the 2003 and 2004 lease years.[7]

---

[5]In 1992, Kmart paid 40,052.87 in percentage rent. This amount did not take Miami Subs' gross sales into account. The parties have since stipulated that the Miami Subs' gross sales should have been factored into the calculation, which would have resulted in a 1992 percentage rent of $58,037.79. This amount is based on 1993 gross sales, including Miami Subs' gross sales, of $17,070,198.75. In 1995-2000, Kmart paid the following amounts as percentage rent: $10,851.93 in 1995, $4,619.89 in 1996, $7,708.47 in 1997, $18,603.18 in 1998, $11,178.77 in 1999, and $13,281.58 in 2000, all of which appear to have been calculated as 1% of excess sales less excess real estate taxes without regard to a "minimum rent."

[6]This was the percentage rent paid in 1992 before the Miami Subs' gross sales amount was factored in.

[7]At this point, the parties had not yet agreed that the gross sales figure included Miami Subs.

In January of 2002, Kmart filed a bankruptcy petition to reorganize in the United Sates Bankruptcy Court for the Northern District of Illinois. On or about May 6, 2003, Kmart emerged from the bankruptcy. In March of 2005, Kmart merged with Sears, Roebuck & Company ("Sears"), at which time a number of Kmart employees were replaced by Sears employees.

On or about January 24, 2005, Charles Andrews addressed a letter to Joan Pappas, Kmart's Lease Administrator. In the letter, Andrews claimed Kmart was in default for failure to include Miami Subs' gross sales in the calculation of percentage rent. Kmart's then attorney James Bastien responded to Andrews' claims in a letter dated February 9, 2005. While the majority of the letter addressed the Miami Subs issue, which is no longer in dispute, Bastien also stated under section labeled "INTERPRETATION OF THE KMART LEASE" that, following the expansion of the building:

> Kmart guaranteed to Landlord (pursuant to the Third Amendment) that Kmart's future annual percentage rent contribution would not be less than the greater of the Base Percentage rent or percentage rent based on the then current gross sales of the expanded Kmart Building (subject to the provisions of the Third Amendment).

In a letter addressed to Andrews dated May 23, 2005, Kmart attorney Kathleen McElroy again addressed Kmart's position regarding the Miami Subs issue (the "McElroy Letter"). The McElroy Letter also explained that as a result of ACO's demand, Kmart had engaged an independent auditor to prepare a calculation of the minimum rent and additional rent due pursuant to the Lease. According to the auditor's report, even if Miami Subs' gross sales were included in the additional rent calculation, Kmart had still overpaid ACO

$143,940.86 during the lease years 1999-2004. The overpayment as calculated by the auditors was due in part to Kmart paying ACO minimum additional rent in years which Kmart's gross sales fell below 1992 sales. Andrews responded by reiterating ACO's interpretation of the lease and demanding payment in accordance with its position.

In a letter dated March 1, 2006, a new Kmart attorney, Wendy Gibson, addressed the ongoing issue as follows:

> Excess Additional Rent. The principal dispute between Kmart and ACO concerns the calculation of additional rent under the Third Amendment to the Lease. ACO has previously seen an audit report of lease obligations prepared for Kmart, and responded to the audit in a letter dated May 26, 2005. We have reviewed ACO's position and, for purposes of this letter, we will accept its argument that the established practice of the parties over multiple years should govern the interpretation of ambiguous documents. This means that we accept ACO's calculation of additional rent under the Third Amendment, *with the exception noted below*, and we thus agree that the minimum additional rent for any year in which the formula is in effect should be $40,052.87. We note, however, that this minimum amount was paid for 2003 and 2004 even though the Third Amendment did not apply in those years because Kmart sales fell below 1992 sales. For those two years, Kmart should have paid no additional rent because the property taxes exceeded one percent of sales. Kmart thus overpaid minimum rent by $80,105.74.

Gibson later added in the letter as follows, addressing the Miami Subs issue:

> ACO did not seek to include the Miami Subs sales in the 1992 rent calculation until long after 1994, as ACO recognized in its December 11, 2005 letter, and for years ACO has accepted $40,052.87 as the minimum rent owed for 1992. Neither party should be able to rely on a course of dealing in its interpretation of one section of the lease but disregard a course of dealing in the interpretation of different sections.

While the parties ultimately resolved the Miami Subs issue, their inability to resolve the issue of whether minimum additional rent is due when gross sales fall below 1992 sales resulted

in Kmart filing this lawsuit. The Court now turns to the parties cross-motions for summary judgment.[8]

## **Summary Judgment Standard**

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. Id. Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in his or her favor. Id. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that

---

[8]The Court notes that over the relevant time period, Kmart has exercised options to extend the Lease on three occasions, each for a five year term. Kmart exercised these extensions in 1997, 2002, and 2007. At the time of each extension, Kmart acknowledged it was exercising its option upon the terms, conditions and rental set forth in the Lease, as amended.

there is a genuine issue for trial. <u>Chelates</u>, 477 U.S. at 324. The evidence must be significantly probative to support the claims. <u>Anderson</u>, 477 U.S. at 248-49.

This Court may not decide a genuine factual dispute at the summary judgment stage. <u>Fernandez v. Bankers Nat'l Life Ins. Co.</u>, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." <u>Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung</u>, 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S. at 248; <u>Hoffman v. Allied Corp.</u>, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. <u>Verbraeken v. Westinghouse Elec. Corp.</u>, 881 F.2d 1041, 1045 (11th Cir. 1989).

## Discussion

### I. Choice of Law

The parties dispute whether the Court should apply Michigan or Florida law in considering Kmart's claims. A federal court sitting in diversity is required to apply the substantive law of the forum state in determining conflict-of-law issues. <u>Fioretti v. Massachusetts General Life Ins. Co.</u>, 53 F.3d 1228, 1235 (11th Cir. 1995). Accordingly, Florida's choice-of-law rules govern this issue.

The subject Lease did not include a choice of law provision. ACO argues the doctrine of *lex loci contractus* dictates Michigan law should apply to Kmart's claims. As stated by the Eleventh Circuit, "the Florida Supreme Court has unambiguously indicated its intent

. . . to adhere to the traditional rule of *lex loci contractus*." Id. Pursuant to this doctrine, "in the absence of a contractual provision specifying the governing law, a contract (other than one for the performance of services) is governed by the law of the state in which the contract is made, *i.e.*, where the last act necessary to complete the contract is done." Id. Because the original Lease was last signed by Kmart's predecessor in Michigan, ACO argues Michigan law should control.

Kmart argues that under Florida law, the validity of a contract to convey an interest in real estate is governed by the law of the state in which the real estate lies. Xanadu of Cocoa Beach, Inc. v. Zetley, 822 F.2d 982, 985 (11th Cir. 1987). The Court thus must address the question of whether the Lease is a contract to convey an interest in real estate. In addressing the issue, ACO cites to the following discussion from a Florida appellate court:

> It is well-settled, under numerous appellate decisions of this State, that there is a distinction between *in rem* actions which directly affect real property, and *in personam* actions which indirectly involve real property. Those actions which indirectly involve land, and are therefore *in personam* in nature, include suits seeking the rescission or cancellation of a contract for the sale of land.[FN2]
>
>> FN2. Litigation directly affecting property would include partition actions, ejectment actions, condemnation actions, quiet title actions, an action to foreclose a mechanic's lien, or an action to foreclose a mortgage on land. *See Publix Super Markets, Inc. v. Cheesbro Roofing, Inc.,* 502 So.2d 484 (Fla. 5th DCA 1987).

Kinarti v. Kinarti, 711 So.2d 139, 140 (Fla. 3d DCA 1998). However, none of the parties have cited to a Florida or Eleventh Circuit case holding lease obligations are either *in rem* or *in personam* in nature.

In further support of its position, ACO cites to a Second Circuit case, In re Barnett, 12 F.2d 73 (2d Cir. 1926). In Barnett, the Second Circuit discussed that:

> The lease in this case . . . was made in the city of New York, where both parties to the lease maintained offices and were engaged in business. It must be admitted that the lease, in so far as it affects the creation of an interest in real estate, is governed by the law of the situs. But although a lease relates to an interest in real property, and in so far as it so relates is governed by the lex loci rei sitae, the personal covenants between the contracting parties, though contained in a contract affecting realty are governed by the lex loci contractus; and as the contract of lease was made in New York, and the deposit was delivered to the lessor in New York, and rent was payable in New York, the law of New York governs as to the purely personal covenants.

Id. at 77. In Barnett, the Court of Appeals considered that the rent was payable in New York. Here, the Lease required rent to be paid wherever the landlord required. The original landlord had its principal place of business in Jacksonville, Florida. The present landlord, ACO, has its principal place of business in Ohio. The property is located in Tampa, Florida.

While this choice-of-law dispute constitutes an interesting intellectual exercise, its resolution is unnecessary if the lease terms are unambiguous. The law of both Florida and Michigan are the same concerning unambiguous contracts.

## II. Ambiguity of Subject Provision

Under Florida law, a contract provision is ambiguous if "it is of an uncertain meaning and may fairly be understood in more ways than one." Continental Cas. Co. v. Borthwick, 177 So. 2d 687 (Fla. 1st DCA 1965). "The unambiguous terms in a contract should be given their plain meaning." Anthony v. Anthony, 949 So. 2d 226, 227 (Fla. 3d DCA 2007). "When a contract is clear and unambiguous, the actual language used in the contract is the

best evidence of the intent of the parties, and the plain meaning of that language controls." Id.

Under Michigan law, whether a contract is ambiguous is a question of law. NILAC Int'l Marketing Group v. Ameritech Services, 362 F.3d 354, 358 (6th Cir. 2004). Moreover, "[i]f contract language is clear and unambiguous, the meaning of that language is also a question of law; the meaning of ambiguous language, however, is a question of fact." Id. "A contract is ambiguous if the language is susceptible to two or more reasonable interpretations." D'Avanzo v. Wise & Marsac, P.C., 565 N.W.2d 915, 918 (Mich. Ct. App. 1997).

During oral argument, the Court asked ACO to identify any ambiguous terms and phrases within Article 2. Counsel was not able to identify any ambiguous terms or phrases. Rather, ACO argues that the following part of the provision is ambiguous where it is silent:

> If, after Tenant expands the building, gross sales are less than the gross sales from either of the two years immediately preceding expansion year, *then there shall be no adjustment to gross sales as provided in this Article 2.* Landlord and Tenant agree that the two comparison lease years shall be the lease years ending November 30, 1992 and November 30, 1993.

(emphasis added). ACO argues Kmart is contending that the words italicized above mean "in those years in which Kmart's sales fall below the level of sales it had in 1992 and 1993, no adjustment is made pursuant to the Third Amendment and *Kmart has no obligation to pay*." However, ACO's position is not consistent with the relief sought by Kmart in its Complaint. Kmart is not seeking a declaratory judgment that it has no obligation to pay

additional rent. Rather, Kmart is seeking declaratory judgment that it has no obligation to pay a *minimum* additional rent for years in which its gross sales fall below the 1992 number.

While it may be inartfully drawn, Article 2 of the Third Amendment to the Lease is not ambiguous. To illustrate why, the Court provides the following examples of how additional rent is calculated under the terms of the Third Amendment[9]:

    **a.    Kmart's gross sales are $20,000,000.**

Article 2 states in pertinent part:

> In the event Tenant expands the Building, and its gross sales are equal to or better than its gross sales for each of the two lease years immediately preceding the lease year in which the expanded portion of the Building is open to the general public (the "expansion year"); then, Tenant's gross sales for the purpose of determining its additional rental obligation pursuant to Article 4 shall be adjusted by multiplying its gross sales by a fraction, the numerator of which is the original store size and the denominator is the expanded store size with the resulting product representing gross sales for the purposes of Article 4. If, after this adjustment, the additional rental obligation is less than it was for either of the two lease years immediately preceding the expansion year, then Tenant's additional rental obligation shall be equal to the greater of the amount paid by Tenant in either of those two years immediately preceding the expansion year.

Kmart's gross sales are equal to or better than gross sales for 1992 and 1993. Thus, Kmart's gross sales must be multiplied by a fraction to account for the increased store size, i.e.,

---

[9] For purposes of this example, the Court has used gross sales amounts of $15,271,749 for 1992 and $14,175,267 for 1993, and has further used $40,052.87 as the amount of additional rent paid by Kmart in 1992. For simplicity, Miami Subs' gross sales have been excluded from this example. The Court has excluded gross sales because the Miami Subs' gross sales figures were not provided to the Court for the 1993 lease year. When using these examples for actual calculations, the parties should add Miami Subs' gross sales to Kmart's gross sales for the 1992 and 1993 lease years.

**$20,000.00 x .814241 = $16,284,820.00**. This product represents "gross sales for the purposes of Article 4." Pursuant to Article 4 of the Lease, additional rent is then calculated as 1% of gross sales in excess of $8,830,000.00:

**$16,284,820.00 - $8,830,000.00 = $7,454,820.00**

**1% of $7,454,820.00 = $74,548.20**

This amount would then be reduced by a portion of the real estate taxes and assessments paid on the property in excess of $40,000.00.[10] Kmart would be obligated to pay the greater of the amount adjusted for taxes or $40,052.87 (the "greater of the amount paid by Tenant in either" 1992 or 1993).[11]

    **b.    Kmart's gross sales for a given lease year are 15,000,000.00.**

In this scenario, Kmart's gross sales are between the gross sales for the years 1992 and 1993. That is, Kmart's gross sales are not "equal to or better than its gross sales for each of" 1992 and 1993. The calculation thus turns to the second to last sentence of the provision:

> If, after Tenant expands the building, gross sales are less than the gross sales from either of the two years immediately preceding expansion year, then there shall be no adjustment to gross sales as provided in this Article 2.

---

[10] Pursuant to Article 5 of the Third Amendment, the excess tax credit would not include any real estate taxes attributed to the expanded portion of the Building.

[11] Taking Miami Subs' gross sales into account, the appropriate comparison amount would be $58,037.79 rather than $40,052.87.

Because gross sales are less than the gross sales of either 1992 or 1993, there is no adjustment made to gross sales. Pursuant to Article 4 of the lease, additional rent is calculated as 1% of gross sales in excess of $8,830,000.00:

$$\$15,000,000.00 - \$8,830,000.00 = \$6,170,000.00$$

$$1\% \text{ of } \$6,170,000.00 = \$61,700.00$$

This amount would then be reduced by the amount of real estate taxes and assessments paid on the property in excess of $40,000.00. The resulting amount would be equal to Kmart's additional rental obligation.

### c. **Kmart's gross sales for a given lease year are 12,000,000.00**.

Kmart's gross sales are below gross sales for 1992 and 1993. Kmart's gross sales are not "equal to or better than its gross sales for each of" 1992 and 1993. The calculation again turns to the second to last sentence of the provision. Because gross sales are less than the gross sales of either 1992 or 1993, there is no adjustment made to gross sales. Pursuant to Article 4 of the lease, additional rent is calculated as 1% of gross sales in excess of $8,830,000.00:

$$\$12,000,000.00 - \$8,830,000.00 = \$3,170,000.00$$

$$1\% \text{ of } \$3,170,000.00 = \$31,700.00$$

This amount would then be reduced by the amount of real estate taxes and assessments paid on the property in excess of $40,000.00. The resulting amount would be equal to Kmart's additional rental obligation.

As illustrated by these examples, the subject provision is clear. It is not subject to more than one interpretation and is not ambiguous under either Florida or Michigan law. Kmart is not obligated to pay a minimum additional rental amount when gross sales fall below the 1992 figure (the larger of the 1992 and 1993 gross sales amounts).

### III. ACO's and Dale Mabry's Defenses

ACO and Dale Mabry have raised a number of affirmative defenses to Kmart's Complaint, including waiver, equitable estoppel, laches, and statute of limitations. Underlying each of these defenses is the argument that a conflict over Article 2 first arose in 1994, and Kmart should have filed suit then to protect its rights. Defendants further assert Kmart's adoption in 2001 of the annual report form with the words "PAY THE GREATER OF 1992 OR CURRENT" was indicative of Kmart's agreement with ACO's position.

While ACO sent Kmart a notice of default in 1994, it never took further action to enforce its position with respect to that lease year. Morever, the first year Kmart actually paid minimum additional rent of $40,052.87[12] when its gross sales were lower than 1992 gross sales was for the lease year 2003. Kmart's gross sales in 2004 again fell below the 1992 figure, and Kmart again paid ACO the minimum additional rental amount. From 2005-2008, Kmart's gross sales continued to fall below the 1992 figure. In each of these years Kmart paid ACO $58,037.79 "under protest," reflecting the Miami Subs' gross sales

---

[12]This was before the parties agreed Miami Subs' gross sales should be included.

adjustment. Thus, other than the payments made "under protest," the only lease years Kmart made the minimum additional rental payment when its sales had fallen below the 1992 figure were 2003 and 2004.

During oral argument the Court explained why, from a common sense standpoint, Defendant's defenses do not apply to an unambiguous contract. If a contract is not ambiguous, neither party can unilaterally change its terms by simply making demands inconsistent with the express language of the contract. For example, if a twenty (20) year lease calls for rent of $10,000.00 per year, a landlord cannot simply start demanding $12,000.00 from a tenant and thereby change the express terms of the lease. Even if the tenant were to comply with the demand and mistakenly pay the extra $2,000.00 for some period of time, such conduct would not change the material terms of the lease. In other words, if the tenant overpaid for the first ten (10) years before realizing its mistake, such a course of conduct would not modify the unambiguous terms of the lease to change the annual rental obligation from $10,000.00 to $12,000.00.

This is precisely the situation in the instant case. Kmart did not waive its rights under the Lease by changing its reporting form in 2001, by overpaying its rent in 2003 and 2004 without protest, or through Bastien's 2005 letter (which was clarified shortly thereafter by the McElroy Letter). Moreover, it is not reasonable for ACO or Dale Mabry to have relied on these overpayments when such payments were inconsistent with the express terms of the Lease and Third Amendment. Likewise, ACO has not waived its claim to have the Miami Subs sales included in gross sales by accepting a lower amount of rent.

Finally, Dale Mabry has argued Kmart's cause of action accrued in either 1994 when a disagreement first arose or in 2001 when Kmart changed its form. However, despite the disagreement in 1994, Kmart did not pay the "minimum additional rent" and ACO took no action to enforce its position at that time.[13] Prior to November of 2003, Kmart did not pay ACO minimum additional rent when its gross sales fell below the 1992 figure. Kmart filed the instant lawsuit on February 29, 2008. Thus, Kmart's claim was filed within both Florida's five year and Michigan's six year limitations periods for actions arising from the breach of a contract or written instrument. See Fla. Stat. § 95.11(2)(2008) and Mich. Comp. Laws Ann. § 600.5807 (2008). Accordingly, the instant action is not time barred.[14]

The Court therefore concludes Kmart should be granted the relief it seeks. This does not mean Kmart will never have an obligation to pay additional rent for a lease year in which its gross sales fall below those of 1992. Rather, in those years, no adjustment should be made to gross sales pursuant to Article 2 of the Third Amendment and additional rent should be calculated as provided in Article 4 of the lease, subject to Article 5 and any additional terms of the Lease that have not been expressly amended. Whether increased real estate taxes ultimately result in no additional rent being paid during said years is irrelevant. The Court will not modify the express terms of the Lease and Third Amendment as previously agreed to by the parties.

---

[13] While Andrews' December 12, 1994 letter informed Kmart that it was in default for failure to pay "minimum additional rent," Kmart never paid the disputed amount and ACO took no further action to enforce its position at that time.

[14] The Court also rejects Defendants' argument that Kmart discharged its claim in bankruptcy. As discussed, the first payment from Kmart to ACO of minimum percentage rent in a lease year where gross sales were below the 1992 figure occurred in November of 2003. This was after Kmart emerged from bankruptcy.

It is therefore ORDERED AND ADJUDGED that:

1. Plaintiff's Corrected Motion for Summary Judgment (Dkt. 53) is **GRANTED**.

2. Defendant Dale Mabry Skyways, Inc.'s Motion for Final Summary Judgment (Dkt. 52) is **DENIED**.

3. Defendant ACO, Inc.'s Supplemented Motion for Summary Judgment Pursuant to Rule 56(c), FED.R.CIV.P. (Dkt. 55) is **DENIED**.

4. Pursuant to the terms of the Lease and the Third Amendment, Kmart is not obligated to pay a minimum annual additional rent of $58,037.79 to ACO, Dale Mabry, or Tropical Gardens of Florida, Inc., in those years in which Kmart's gross sales are less than its gross sales were in 1992.

5. To the extent Kmart overpaid ACO for additional rent with respect to lease years 2003-2008, Kmart is entitled to a refund or offset from future rent. The parties shall calculate additional rent for those lease years as provided in this Order.

6. The Clerk is directed to enter **FINAL SUMMARY JUDGMENT** in favor of Plaintiff and against Defendants.

7. All pending motions are denied as moot. The Clerk is directed to close this case.

**DONE** and **ORDERED** in Tampa, Florida on March 24, 2009.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:** Counsel/Parties of Record   S:\Even\2008\08-cv-418.msj.frm